Luc A. Despins, Esq.
James T. Grogan, Esq.
PAUL HASTINGS JANOFSKY & WALKER LLP
Park Avenue Tower
75 E. 55th Street, First Floor
New York, NY 10022
Telephone: (212) 318-6000
Facsimile: (212) 319-4090

*Counsel to the Plaintiffs*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
                                                            :
**In re:**                                     :     **Chapter 11**
                                                            :
**FAIRPOINT COMMUNICATIONS, INC.,** *et al.*,:     **Case No. 09-16335 (BRL)**
                                                            :
          **Reorganized Debtors.**       :     **(Jointly Administered)**
                                                            :
------------------------------------------------------------x
                                                            :
**FAIRPOINT COMMUNICATIONS, INC. and**   :
**FAIRPOINT LOGISTICS, INC.**              :
                                                            :
          **Plaintiffs,**                      :
                                                            :     **Adv. Proc. No. __**
          **v.**                               :
                                                            :
**AMERICAN EXPRESS TRAVEL RELATED**        :
**SERVICES COMPANY, INC.,**                 :
                                                            :
          **Defendant.**                       :
------------------------------------------------------------x

### COMPLAINT AGAINST, AND OBJECTION TO CLAIMS FILED BY, AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC.

FairPoint Communications, Inc. ("FairPoint Communications") and FairPoint Logistics,

Inc. ("FairPoint Logistics", together with FairPoint Communications, the "Plaintiffs") hereby

file this complaint against, and objection to claims filed by, American Express Travel Related

Services Company, Inc. (the "Defendant" or "AMEX"), and alleges as follows:

## I.    INTRODUCTION

1.      In March 2008, FairPoint Communications and AMEX entered into a Corporate
Services Commercial Account Agreement (as amended, modified or supplemented, the "Account
Agreement")[1] pursuant to which AMEX issued corporate charge cards to FairPoint
Communications and its employees.  Beginning approximately five months prior the
commencement of these chapter 11 cases, the relationship between the two parties changed due
to AMEX's concerns over the creditworthiness of FairPoint Communications.  AMEX started to
demand improved treatment relative to other creditors, including (a) requiring FairPoint
Communications to enter into a pre-bankruptcy filing agreement, (b) demanding that FairPoint
Communications provide AMEX with a letter of credit as collateral, and (c) forcing FairPoint
Communications to switch to a pre-pay arrangement on its accounts.  Even after the
commencement of these chapter 11 cases, AMEX relentlessly sought improved treatment by
demanding immediate payment on its prepetition claims.  When these demands went unmet,
AMEX terminated the Account Agreement and cancelled all of FairPoint Communications'
charge cards even though FairPoint Communications had pre-funded some of the charge
accounts.

2.      This Complaint seeks the following relief against AMEX.  First, pursuant to
sections 547 and 550 of title 11 of the United States Code (the "Bankruptcy Code"), this
Complaint seeks the recovery of at least $1,725,948.35 in preferential transfers made to AMEX
from July 28, 2009 through October 25, 2009 (the "Preference Period").  Second, pursuant to
sections 542, 549 and 550 of the Bankruptcy Code, this Complaint seeks the recovery of
prepetition and postpetition payments that FairPoint Communications made to pre-fund its

---

[1]      A copy of the Account Agreement is annexed as Exhibit 1.

accounts prior to termination of its charge cards by AMEX. Such payments constitute property of the estate, which despite demand, AMEX has refused to turnover. Third, this Complaint seeks damages resulting from AMEX's improper cancellation of FairPoint Communications' accounts and breach of its agreements with FairPoint Communications. Fourth, this Complaint also seeks judgment against AMEX for willfully violating the automatic stay when it cancelled FairPoint Communications' accounts. Fifth, this Complaint constitutes an objection to AMEX's proofs of claim. Among other things, AMEX's proofs of claim must be disallowed pursuant to section 502(d) of the Bankruptcy Code unless and until AMEX returns all avoidable transfers described in this Complaint.

## II.   PARTIES

3.      FairPoint Communications is a Delaware corporation with a principal place of business in Charlotte, North Carolina. FairPoint Communications is a reorganized debtor in the above-captioned chapter 11 cases.

4.      FairPoint Logistics is a South Dakota corporation with a principal place of business in Portland, Maine. FairPoint Logistics is a reorganized debtor in these chapter 11 cases.

5.      On information and belief, AMEX is a corporation organized and existing under the laws of New York. AMEX is subject to personal jurisdiction before this Court because AMEX has appeared and filed claims in the above-captioned chapter 11 cases. AMEX can be served with process by mailing a copy of the summons and this Complaint to the attention of an officer, a managing or general agent, at 200 Vesey Street, New York, NY 10285, or by and through its registered agent, CT Corporation System, at 111 Eight Avenue, New York, New York 10011.

## III.    JURISDICTION AND VENUE

6.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(a).

7.    This adversary proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

8.    This adversary proceeding is commenced pursuant to Rules 3007, 7001, 7008 and 7020 of the Federal Rules of Bankruptcy Procedure.

9.    Venue is proper in this district pursuant to 28 U.S.C. § 1409.

10.    Pursuant to section 15 of the Plan (as defined below) and paragraph 66 of the Confirmation Order (as defined below), this Court has exclusive jurisdiction of all matters in connection with, arising out of, or related to these chapter 11 cases and the Plan (as defined below) pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including, without limitation (a) to determine any and all adversary proceedings and contested matters, (b) to hear and determine any timely objections to disputed claims, in whole or in part, (c) to hear and determine any rights, claims or causes of action, including all avoidance and recovery actions under section 502(d), 542, 547, 550 and 533 of the Bankruptcy Code, held by or accruing to FairPoint pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory, and (d) to recover all assets of FairPoint and property of FairPoint's estates wherever located.

## IV.    GENERAL ALLEGATIONS

### A.    Events Leading Up to Chapter 11 Cases

11.    On January 15, 2007, FairPoint Communications entered into a merger agreement ("Merger Agreement") with Verizon Communications Inc. ("Verizon") and certain subsidiaries

of Verizon, pursuant to which FairPoint Communications committed to purchase and assume Verizon's landline operations in northern New England (the "NNE Operations").

12.    On March 31, 2008 (the "Closing Date"), FairPoint Communications completed the acquisition of the NNE Operations. On the Closing Date, FairPoint Communications and certain subsidiaries of FairPoint Communications (including FairPoint Logistics) also entered into a $2.03 billion secured credit facility and issued $551 million in senior unsecured notes to fund the acquisition of the NNE Operations. The Credit Facility was guaranteed, jointly and severally, by the first-tier domestic subsidiaries of FairPoint Communications, including FairPoint Logistics.

13.    In connection with the acquisition of the NNE Operations, FairPoint Communications also added additional bank accounts to its existing cash management system. At all times relevant to this Complaint, FairPoint Communications maintained a master concentration account (the "Master Concentration Account") with the bank that provided cash management services to FairPoint Communications and its affiliated reorganized debtors (collectively, "FairPoint"). The Master Concentration Account was linked to various sub-accounts that were used to disburse payments to FairPoint's vendors. FairPoint Communications would from time to time, transfer funds into such disbursement accounts for the benefit of FairPoint's creditors. One such disbursement account was used by FairPoint Logistics (the "FairPoint Logistics Disbursement Account"). FairPoint Logistics acts as a disbursement agent for FairPoint Communications.

14.    The Master Concentration Account and the FairPoint Logistics Disbursement Account are linked and funds flow between the two accounts daily at the direction of FairPoint Communications. At all times relevant to this Complaint, FairPoint Communications had control

over these bank accounts and had discretion to make payments out of the FairPoint Logistics Disbursement Account to satisfy its obligations. The officers of FairPoint Communications and FairPoint Logistics are identical. These officers have signature authority over the FairPoint Logistics Disbursement Account and the Treasurer makes all of the funding decisions related to the FairPoint Logistics Disbursement Account.

**B.      The Prepetition Relationship Between FairPoint Communications and AMEX**

15.      Just prior to the Closing Date, FairPoint Communications and AMEX entered into the Account Agreement. At that time, AMEX established two accounts for the benefit of FairPoint Communications: the Corporate Card Account and the Corporate Purchasing Card Account (collectively the "Original Accounts").

16.      To implement the Corporate Card Account, AMEX issued individual corporate cards to FairPoint Communications' employees for business use. To implement the Corporate Purchasing Card Account, AMEX issued corporate purchasing cards to FairPoint Communications' employees, departments, divisions or other business groups for the sole use of purchasing goods and services on behalf of FairPoint Communications. FairPoint Communications was liable for all charges incurred on the Original Accounts. FairPoint Communications paid for all charges incurred on the Original Accounts in arrears.

17.      In the first quarter of 2009, FairPoint Communications began to encounter financial difficulties and suffered credit downgrades by credit rating agencies. AMEX became increasingly concerned over the creditworthiness of FairPoint Communications. Recognizing FairPoint Communications' precarious financial condition, as well as its own credit exposure to FairPoint Communications, AMEX began concentrating on improving its position relative to other creditors.

18.    In an email dated April 29, 2009, Keri Tasman, an Account Development Director for AMEX informed FairPoint Communications that AMEX "**watch[es] carefully for any deterioration of our client's financial position and their response to the evolving market conditions.  We are currently manually underwriting or re-underwriting our entire account base, with specific focus on accounts that have been recently downgraded or those with high exposures.**"

19.    In order to ensure continuation of the Original Accounts, on April 29, 2009, AMEX demanded that FairPoint Communications comply with five new requirements.

20.    First, for all accounts, AMEX would begin enforcing 30-day payment terms at the point of sale.

21.    Second, FairPoint Communications was required to execute a pre-bankruptcy filing agreement (the "Pre-filing Agreement", attached as Exhibit 2) with AMEX to continue its programs.  AMEX demanded that FairPoint Communications provide verbal or written acknowledgment of its intent to execute the Pre-filing Agreement by May 8, 2009, with actual execution due by May 25, 2009.  AMEX informed FairPoint Communications that its failure to meet these deadlines would result in immediate suspension of FairPoint Communications' card programs.

22.    Third, effective as of April 29, 2009, AMEX capped its exposure on all accounts under the Corporate Card program based upon historical usage of the cards over the preceding four months.

23.    Fourth, effective as of April 29, 2009, AMEX began capping its exposure on the Corporate Purchasing Card program at $450,000.

24.     Fifth, according to Ms. Tasman, no additional cards would be issued to FairPoint

Communications without "further risk mitigating actions" and "manual review" by AMEX.

25.     AMEX continued to pressure FairPoint Communications, and upon threat of

termination, forced FairPoint Communications to execute the Pre-filing Agreement.  The Pre-

filing Agreement amended the Account Agreement and it contained the following provisions,

among others:

> a.     "**In the event that the Company files for bankruptcy, the parties hereby agree that the Company will request to satisfy any prepetition amounts due and owing pursuant to a First Day Order, and shall continue to pay all amounts to American Express for post-petition charging activity** ."

> b.     "**The Corporate Card Program should be included in the Employee Reimbursement Motion. . . .  The Central Billed Accounts and Corporate Purchasing Card Program should be included in the debtor's critical vendor motion.**"

> c.     "**In the event that Company commences Chapter 11 reorganization, Company and American Express agree to enter into an addendum to the Card Acceptance Agreement that will permit Company to continue, ratify and adopt the Card Acceptance Agreement subject to, among other things, the following:**

>> **(i) Company's curing all pre-petition and post-petition defaults, if any, under the Card Acceptance Agreement, the Account agreements, and any other agreements between Company and American Express and/or any of American Express' parent, subsidiaries or affiliates….**"

> d.     "**American Express will take all reasonable precautions to ensure the Accounts remain open while the parties act in accord with this agreement. Should an Account be accidentally closed, American Express will open the Account in a reasonable time period.**"

26.     Notwithstanding FairPoint Communications' execution of the Pre-filing

Agreement, AMEX continued to demand improved treatment under the Account Agreement in

the form of collateral.  Specifically, by email dated June 15, 2009, Ms. Tasman informed

FairPoint Communications that because of "**the most recent Moody's downgrade of FairPoint**

**to a Caa3 rating . . . American Express is requesting collateral for all client-liability accounts.**" AMEX demanded that FairPoint Communications post collateral in the form of a letter of credit or certificate of deposit. AMEX informed FairPoint Communications that failure to provide collateral would result in immediate suspension of the Original Accounts. Prior to this date, AMEX had never required collateral from FairPoint Communications.

27. On June 29, 2009, FairPoint Communications obtained a $300,000 letter of credit from Bank of America, N.A. for the benefit of AMEX. The letter of credit was provided to AMEX as security in the event that FairPoint Communications defaulted under the Account Agreement.

28. Nevertheless, AMEX remained concerned about its exposure to risk with FairPoint Communications because the letter of credit was not issued in the correct entity name. The beneficiary of the letter of credit was listed as "American Express" even though the card programs were issued by American Express Travel Related Services Company, Inc. As such, AMEX requested that FairPoint Communications amend the letter of credit to change the listed beneficiary name to specify that the letter of credit was issued to AMEX. In an email dated August 27, 2009, Kimberley S. Holleman, an Account Development Manager for AMEX, informed FairPoint Communications that "**it is really important that we receive [the amended letter of credit] back as soon as possible to avoid interruption to your American Express program. . . . I am very concerned that if we do not receive the required documentation soon, your program will be impacted until the necessary documents are received.**"

29. When FairPoint Communications did not immediately amend the letter of credit, AMEX demanded that FairPoint Communications replace its Corporate Purchasing Card Account with AMEX's "Pay Ahead" program. Under this new arrangement, AMEX proposed to

discontinue the Corporate Purchasing Card Account and set up two new pre-paid accounts for FairPoint Communications: a Business Travel Account and a Corporate Meeting Card Account (collectively, the "Pay Ahead Accounts").  FairPoint Communications would be required to fund the Pay Ahead Accounts before charging on cards issued for those accounts.  Moreover, FairPoint Communications would only be allowed to charge up to the pre-funded amount.

30.    In an email, dated September 25, 2009, Ms. Holleman stated that **"[a]s you know we absolutely have to get [the pay-ahead arrangement] executed quickly. . . .  During my last conversation with our risk group, they stated that we need to get this wrapped up before your cycle cut to ensure program continuation.  Key to that success would be acting on the pay ahead and actually funding the [Pay Ahead Accounts] asap as well as getting the [Corporate Meeting Cards] issued asap.**"

31.    Shortly thereafter, FairPoint Communications executed an addendum to the Account Agreement, dated as of September 15, 2009 (the "Pay Ahead Agreement", attached as Exhibit 3, and together with the Account Agreement and the Pre-filing Agreement, the "AMEX Agreements").  The pertinent provisions of the Pay Ahead Agreement are as follows:

    a.    "The Pay Ahead service provides you with an option to prepay your eligible commercial card account pursuant to terms and conditions determined by us."

    b.    "Funds remitted by you pursuant to the Pay Ahead Service will not become available for your use for 48 hours after remittance or such shorter or longer interval as we may determine from time to time. We may limit the balance you may maintain in the Pay Ahead Service at our discretion."

    c.    "Available monthly spending amounts for Pay Ahead Service may not exceed 30% of your monthly revenues."

32.    On October 5, 2009, FairPoint Communications wired $40,000 to AMEX to pre-fund the Business Travel Account and $300,000 to AMEX to pre-fund the Corporate Meeting Card Account.

33.     Although FairPoint Communications entered into the pay-ahead arrangement for the Pay Ahead Accounts, charges on the Corporate Card Account continued to be paid in arrears.

34.     To implement the Business Travel Account, AMEX issued a billing account number that FairPoint Communications' travel agents could use to charge air and rail transportation tickets.  FairPoint Communications was required to fund the Business Travel Account before charging on such account.  FairPoint Communications could charge on the Business Travel Account only up to the pre-funded amount.

35.     To implement the Corporate Meeting Card Account, AMEX issued corporate meeting cards to certain of FairPoint Communications' employees, departments, divisions or other business groups for use in charging corporate meeting related expenses.  FairPoint Communications was required to fund the Corporate Meeting Card Account before charging on that account.  FairPoint Communications could charge on the Corporate Meeting Card Account only up to the pre-funded amount.

36.     On October 16, 2009, AMEX terminated the Corporate Purchasing Card Account.

37.     On October 22, 2009, AMEX surrendered the letter of credit to FairPoint Communications.

**C.     The Postpetition Relationship Between FairPoint Communications and AMEX**

38.     On October 26, 2009 ("Petition Date"), FairPoint commenced voluntary cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.

39.     By order, dated January 13, 2011 [Main Case Docket No. 2113, the "Confirmation Order"], this Court confirmed the *Debtors' Third Amended Joint Plan Of Reorganization Under Chapter 11 Of The Bankruptcy Code* [Main Case Docket No. 2115, the "Plan"].  On January 24, 2011, the Plan became effective in accordance with its own terms.

Pursuant to the Plan, no unsecured creditors received full payment in cash on account of claims against FairPoint Communications.

40.     On the Petition Date, FairPoint filed an employee benefits motion [Main Case Docket No. 10, the "Employee Motion")], which among other things, sought authorization to pay prepetition amounts due to AMEX on the Corporate Card Account because these amounts were charged by employees on behalf of FairPoint Communications.

41.     On October 27, 2009, the court entered an interim order approving the Employee Motion on an interim basis [Main Case Docket No. 42], and on November 18, 2009, the Court entered a final order approving the Employee Motion on a final basis [Main Case Docket No. 164].

42.     Despite the fact that FairPoint Communications had pre-funded the Pay Ahead Accounts and had sought authority to pay prepetition amounts owed to AMEX under the Employee Motion, by email dated November 4, 2009, AMEX informed FairPoint Communications that AMEX wanted immediate payment for prepetition balances owed to AMEX under authority of a critical vendor or essential supplier motion.

43.     FairPoint Communications continued to honor its obligations under the Account Agreement and the Pay Ahead Agreement and, on November 5, 2009, FairPoint Communications wired $140,000 to AMEX to fund the Corporate Meeting Card Account and wired $7,000 to AMEX to fund the Business Travel Account.

44.     Despite these pre-payments, on November 6, 2009, AMEX informed FairPoint Communications that if it could not pay the prepetition balance owed to AMEX under authority of a critical vendor motion, then AMEX would exercise its purported right to cancel all of FairPoint Communications' card programs, including the Pay Ahead Accounts.

45.     FairPoint Communications did not immediately acquiesce to AMEX's payment demands.  As a result, on November 11, 2009 (the "Termination Date"), AMEX informed FairPoint Communications that AMEX was terminating the entire commercial card relationship with FairPoint Communications.  On the Termination Date, all of the outstanding cards issued under the Account Agreement and the Pay Ahead Agreement were cancelled and of no further use.

46.     At no time did AMEX ever seek relief from the automatic stay imposed by section 362 of the Bankruptcy Code.

47.     After AMEX terminated the cards, FairPoint Communications demanded that AMEX return all pre-payments made to the Pay Ahead Accounts.  AMEX refused to do so.  To date, AMEX has refused to return all pre-payments made to the Pay Ahead Accounts as of the Termination Date.

## D.     AMEX's Claims

48.     On January 29, 2010, AMEX filed proofs of claim nos. 717 through and including 759 (the "Wrong Debtor Claims") against various debtors in these chapter 11 cases.

49.     On February 4, 2010, the Court entered the Order Establishing Deadline and Procedures for Filing Proofs of Claim and Approving Manner of Notice Thereof [Main Case Docket No. 568, the "Bar Date Order"], which established March 18, 2010 at 5:00 p.m. as the last date and time by which proofs of claim must be received by the official claims agent in FairPoint's chapter 11 cases (the "Bar Date").

50.     On March 18, 2010, AMEX filed proof of claim no. 6534 ("Claim 6534") against FairPoint Communications.  In Claim 6534, AMEX asserted a secured claim of $163,927.71 against FairPoint Communications arising out of the Account Agreement.  AMEX based its secured claim on the assertion that, under New York state law and section 553 of the Bankruptcy

Code, it holds a valid and enforceable right to setoff any prepetition charges made by FairPoint Communications against any prepetition payments made by FairPoint Communications. In Claim 6534, AMEX also asserted an unsecured claim of $198,094.85 against FairPoint Communications arising out of the Account Agreement.

51.     On June 15, 2010, FairPoint filed an objection [Main Case Docket No. 1476] to the Wrong Debtor Claims filed by AMEX because AMEX filed these claims against debtors that were not liable to AMEX. On July 15, 2010, this Court entered an order [Main Case Docket No. 1664, the "AMEX Claim Order")] authorizing FairPoint to update the claims register with respect to the Wrong Debtor Claims to reflect these claims against FairPoint Communications.

52.     After the Bar Date, on September 23, 2010, AMEX filed proofs of claim nos. 8095 through and including 8137 amending the Wrong Debtor Claims (the "Amended Claims", together with the Wrong Debtor Claims and Claim 6534, the "Proofs of Claim") to $0.

53.     Pursuant to section 3.1 of the Plan and paragraph 48 of the Confirmation Order, the Court established March 25, 2011 as the deadline to file Administrative Expense Claims (as defined in the Plan) (the "Administrative Bar Date").

54.     AMEX did not file any Administrative Expense Claims (as defined in the Plan) by the Administrative Bar Date.

## V.     CAUSES OF ACTION AND OBJECTION TO CLAIMS

### COUNT 1
**(Claim to Avoid Preferential Transfers
Pursuant to 11 U.S.C. §§ 547 and 550)**

55.     Plaintiffs incorporate by reference all prior paragraphs of this Complaint.

56.     As more particularly described on Exhibit 4 attached hereto and incorporated by reference herein, FairPoint Communications made the transfers identified on Exhibit 4 (the "Preferential Transfers") to AMEX in an aggregate amount of not less than $1,725,948.35.

57.     The Preferential Transfers were transfers of an interest of FairPoint Communications in property.

58.     The Preferential Transfers were made to or for the benefit of AMEX, a creditor of FairPoint Communications.

59.     The Preferential Transfers were made for or on account of antecedent debts owed to AMEX by FairPoint Communications before such Preferential Transfers were made.

60.     The Preferential Transfers were made during the Preference Period.

61.     AMEX was the initial transferee of the Preferential Transfers, or the entity for whose benefit the Preferential Transfers were made, or was the immediate or mediate transferee of the initial transferee receiving the Preferential Transfers.

62.     The Preferential Transfers were made while FairPoint Communications was insolvent.

63.     The Preferential Transfers enabled AMEX to receive more than AMEX would receive if: (i) FairPoint Communications' chapter 11 case was administered under chapter 7 of the Bankruptcy Code; (ii) the Preferential Transfers had not been made; and (iii) AMEX had received payment of its claims to the extent provided by the Bankruptcy Code.

64.     FairPoint Communications respectfully requests that the Court enter a judgment avoiding the Preferential Transfers as preferences under section 547 of the Bankruptcy Code, and entitling FairPoint Communications to recover the Preferential Transfers from AMEX under section 550 of the Bankruptcy Code, plus prejudgment and post-judgment interest.

**<u>COUNT 2</u>**
**(Claim to Avoid Postpetition Pay Ahead Transfers**
**Pursuant to 11 U.S.C. §§ 549 and 550)**

65.     Plaintiffs incorporate by reference all prior paragraphs of this Complaint.

66.     As of the date hereof, AMEX owes FairPoint Communications at least (a) $7,000 in postpetition pre-payments made to the Business Travel Account, and (b) $140,000 in postpetition pre-payments made to the Corporate Meeting Card Account (collectively, the "Postpetition Pay Ahead Transfers").

67.     Despite demand, AMEX has wrongfully failed and refused to return the Postpetition Pay Ahead Transfers.

68.     The Postpetition Pay Ahead Transfers were made after the Petition Date.

69.     The Postpetition Pay Ahead Transfers were property of the estate.

70.     Due to AMEX's decision to terminate and cancel all existing card programs, including the Pay Ahead Accounts, the Postpetition Pay Ahead Transfers were not made in the ordinary course of business.  As such, they were not authorized under the Bankruptcy Code or by the Court.

71.     The Postpetition Pay Ahead Transfers are avoidable pursuant to section 549 of the Bankruptcy Code.

72.     FairPoint Communications respectfully requests that the Court enter a judgment avoiding the Postpetition Pay Ahead Transfers under section 549 of the Bankruptcy Code, and entitling FairPoint Communications to recover the Postpetition Pay Ahead Transfers from AMEX under section 550 of the Bankruptcy Code, plus prejudgment and post-judgment interest.

**COUNT 3**
**(Declaratory Judgment Regarding**
**AMEX's Setoff Rights)**

73.     Plaintiffs incorporate by reference all prior paragraphs of this Complaint.

74.     AMEX has filed Claim 6534 and has asserted a right of setoff in the amount of $163,927.71.

75.     AMEX owes FairPoint Communications (a) $40,000 in prepetition pre-payments made to the Business Travel Account, and (b) $300,000 in prepetition pre-payments made to the Corporate Meeting Card Account (collectively, the "Prepetition Pay Ahead Transfers").

76.     Section 553(a)(3) of the Bankruptcy Code prohibits AMEX from asserting a right of setoff against the Prepetition Pay Ahead Transfers

77.     The Prepetition Pay Ahead Transfers were a debt owed to FairPoint Communications by AMEX.

78.     The Prepetition Pay Ahead Transfers were made within the 90 days period before the Petition Date.

79.     The Prepetition Pay Ahead Transfers were made while FairPoint Communications was insolvent.

80.     The Prepetition Pay Ahead Transfers were made for the purpose of AMEX obtaining security by a right of setoff against FairPoint Communications.  AMEX has asserted a right of setoff against the Prepetition Payments in Claim 6534.

81.     The Prepetition Pay Ahead Transfers  were not made for the purpose of AMEX obtaining a setoff of a kind described in sections 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 555, 556, 559, 560, or 561 of the Bankruptcy Code.

82.     FairPoint Communications respectfully requests that the Court declare the rights and liabilities of the parties, including a declaration that AMEX is prohibited from asserting a right of setoff against the Prepetition Pay Ahead Transfers pursuant to section 553(a)(3) of the Bankruptcy Code.

## COUNT 4
### (Turnover of Amounts Pursuant
### To 11 U.S.C. §§ 542 and 550)

83.     Plaintiffs incorporate by reference all prior paragraphs of this Complaint.

84.     FairPoint Communications has a legal and equitable interest under section 542 of the Bankruptcy Code in the Prepetition Pay Ahead Transfers currently held by AMEX.

85.     FairPoint Communications has a legal and equitable interest under section 542 of the Bankruptcy Code in the Postpetition Pay Ahead Transfers currently held by AMEX.

86.     Despite demand, AMEX has wrongfully failed and refused to return the Prepetition Pay Ahead Transfers to FairPoint Communications.

87.     Despite demand, AMEX has wrongfully failed and refused to return the Postpetition Pay Ahead Transfers to FairPoint Communications.

88.     AMEX has no legal right to withhold the Prepetition Pay Ahead Transfers.

89.     AMEX has no legal right to withhold the Postpetition Pay Ahead Transfers.

90.     FairPoint Communications respectfully requests that the Court enter a judgment against AMEX, pursuant to sections 542 and 550 of the Bankruptcy Code, directing AMEX to turnover the Prepetition Pay Ahead Transfers and the Postpetition Pay Ahead Transfers to FairPoint Communications, plus prejudgment and post-judgment interest.

## COUNT 5
### (Claim for Breach of AMEX Agreements)

91.     Plaintiffs incorporate by reference all prior paragraphs of this Complaint.

92.     FairPoint Communications and AMEX were parties to the AMEX Agreements.

93.     The AMEX Agreements were binding on AMEX and FairPoint Communications.

94.     Under the AMEX Agreements, AMEX promised, among other things, that all accounts would remain open for the benefit of FairPoint Communications even if FairPoint Communications commenced a case under chapter 11 of the Bankruptcy Code.

95.     FairPoint Communications funded the Pay Ahead Accounts before charging on such accounts.  The funds in the Pay Ahead Accounts were a debt that AMEX owed to FairPoint Communications.

96.     AMEX never sought relief from the automatic stay in order to exercise any termination rights it may have had under the AMEX Agreements.

97.     AMEX improperly terminated the AMEX Agreements.

98.     AMEX improperly cancelled FairPoint Communications' accounts with AMEX.

99.     AMEX materially breached the AMEX Agreements and violated its obligations thereunder.

100.    AMEX breached its implied obligation of good faith and fair dealing.

101.    As a direct and proximate result of the foregoing breaches on the part of AMEX, FairPoint Communications was damaged in an amount to be proven at trial.

102.    FairPoint Communications respectfully requests the Court to enter a judgment entitling it to recover damages in an amount to be proven at trial, plus prejudgment and post-judgment interest.

**COUNT 6**
**(Disallowance of Claims**
**Pursuant to Section 502(d))**

103.    Plaintiffs incorporate by reference all prior paragraphs of this Complaint.

104.    AMEX has not paid FairPoint Communications the Preferential Transfers, which are avoidable and recoverable under sections 547 and 550 of the Bankruptcy Code.

105. AMEX has not paid FairPoint Communications the Postpetition Pay Ahead Transfers, which are avoidable and recoverable under sections 542, 549 and 550 of the Bankruptcy Code.

106. AMEX has not paid FairPoint Communications the Prepetition Pay Ahead Transfers, which are recoverable under section 542 of the Bankruptcy Code.

107. Pursuant to section 502(d) of the Bankruptcy Code, FairPoint Communications respectfully requests the Court to enter a judgment disallowing any claims filed by or asserted by AMEX, including the Proofs of Claim, or scheduled in favor of AMEX until AMEX has paid any and all amounts for which they are determined to be liable under sections 542, 547, 549 and 550 of the Bankruptcy Code.

## COUNT 7
### (Additional Objections to AMEX's Claims)

108. Plaintiffs incorporate by reference all prior paragraphs of this Complaint.

109. The Amended Claims were filed after the Bar Date and are inconsistent with the AMEX Claim Order.

110. AMEX did not file any Administrative Expense Claims (as defined in the Plan) by the Administrative Bar Date.

111. FairPoint Communications respectfully requests the Court enter a judgment (a) disallowing and expunging the Amended Claims, and (b) declaring that any Administrative Expense Claims (as defined in the Plan) that AMEX may have held are now discharged and forever barred.

## COUNT 8
### (Fraudulent Transfer Claim Against AMEX)

112. Pleading in the alternative, Plaintiffs incorporate by reference all prior paragraphs of this Complaint.

113. On or within two years prior to the Petition Date, money was transferred from the FairPoint Logistics Disbursement Account to AMEX (the "Fraudulent Transfers").

114. FairPoint Logistics is not a party to the AMEX Agreements or any other agreement with AMEX.

115. AMEX has not asserted any claims against FairPoint Logistics.

116. To the extent that funds transferred to AMEX from the FairPoint Logistics Disbursement Account were not transfers of FairPoint Communications' property, such funds were transfers of an interest of FairPoint Logistics in property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code.

117. FairPoint Logistics received less than a reasonably equivalent value in exchange for the Fraudulent Transfers.

118. At the time of Fraudulent Transfers, FairPoint Logistics was insolvent, or became insolvent as a result of the Fraudulent Transfers.

119. In the alternative, at the time of the Fraudulent Transfers, FairPoint Logistics was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with FairPoint Logistics was an unreasonably small capital.

120. In the alternative, at the time of each of the Fraudulent Transfers, FairPoint Logistics intended to incur, or believed that it would incur, debts that would be beyond FairPoint Logistics' ability to pay as such debts matured.

121.    The Fraudulent Transfers constitute fraudulent transfers within the meaning of section 548 of the Bankruptcy Code and are avoidable by FairPoint Logistics pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from the Defendants pursuant to section 550(a) of the Bankruptcy Code.

122.    As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, Plaintiffs are entitled to a judgment: (a) avoiding and preserving the Fraudulent Transfers; (b) directing that the Fraudulent Transfers be set aside; and (c) recovering the Fraudulent Transfers, or the value thereof, from the Defendant for the benefit of the estates, plus prejudgment and post-judgment interest.

## COUNT 9
### (Violation of the Automatic Stay)

123.    Plaintiffs incorporate by reference all prior paragraphs of this Complaint.

124.    Upon the filing of a bankruptcy petition, section 362(a) of the Bankruptcy Code operates as an automatic stay, applicable to all entities, of any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate, and of any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the bankruptcy case.

125.    On October 27, 2009, the Court entered its *Order Pursuant to Bankruptcy Code Sections 105(a) Enforcing Protections of Bankruptcy Code Section 362, 365(e)(1) and 525* [Main Case Docket No. 39, the "Stay Order"] enforcing the protections of the automatic stay.

126.    AMEX demanded immediate payment of its prepetition claims.  By terminating the AMEX Agreements, cancelling the Pay Ahead Accounts and all other card programs, and refusing to disgorge money wrongfully held by AMEX when FairPoint Communications failed

to acquiesce to these demands, AMEX exercised control over property of the estate and took actions to collect or recover on its prepetition claims.

127. The Prepetition Pay Ahead Transfers are property of the estate.

128. AMEX has no legal right in the Prepetition Pay Ahead Transfers.

129. Despite demand, AMEX has refused to return, and has not yet returned, the Prepetition Pay Ahead Transfers.

130. AMEX's refusal to return the Prepetition Pay Ahead Transfers to FairPoint Communications is an exercise of control over property of the estate and a violation of section 362(a)(3) of the Bankruptcy Code.

131. In addition, the Postpetition Pay Ahead Transfers are property of the estate.

132. AMEX has no legal right in the Postpetition Pay Ahead Transfers.

133. Despite demand, AMEX has refused to return, and has not yet returned, the Postpetition Pay Ahead Transfers.

134. AMEX's refusal to return the Postpetition Pay Ahead Transfers to FairPoint Communications is an exercise of control over property of the estate and a violation of section 362(a)(3) of the Bankruptcy Code.

135. AMEX's threats to terminate – and ultimately, its termination of – FairPoint Communications' accounts with AMEX unless FairPoint Communications paid AMEX's prepetition debt was a violation of section 362(a)(6) of the Bankruptcy Code.

136. Plaintiffs respectfully request that the Court enter a judgment declaring that AMEX is in contempt of Court because it willfully violated the automatic stay and the Stay Order by (a) terminating the AMEX Agreements and cancelling all of FairPoint

Communications' accounts, including the Pay Ahead Accounts, and (b) refusing to return the Prepetition Pay Ahead Transfers and the PostPetition Pay Ahead Transfers.

137.    Plaintiffs also respectfully request that the Court enter a judgment (a) prohibiting AMEX from asserting any rights of setoff AMEX may have against FairPoint Communications, and (b) ordering AMEX to pay sanctions for its violation of the automatic stay, including but not limited to, all attorneys fees and other costs associated with bring this action.

## VI.    PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiffs respectfully request the following relief:

A.    On Count 1, that judgment be entered in favor of Plaintiffs and against Defendant pursuant to sections 547 and 550 of the Bankruptcy Code, avoiding the Preferential Transfers and entitling FairPoint Communications to recover the Preferential Transfers from AMEX;

B.    On Count 2, that judgment be entered in favor of Plaintiffs and against Defendant pursuant to sections 549 and 550 of the Bankruptcy Code, avoiding the Postpetition Pay Ahead Transfers and entitling FairPoint Communications to recover the Postpetition Pay Ahead Transfers from AMEX;

C.    On Count 3, that judgment be entered in favor of Plaintiffs and against Defendant declaring that AMEX is prohibited from asserting a right of setoff against the Prepetition Pay Ahead Transfers pursuant to section 553(a)(3) of the Bankruptcy Code and under New York state law;

D.    On Count 4, that judgment be entered in favor of Plaintiffs and against Defendant pursuant to sections 542 and 550 of the Bankruptcy Code, directing AMEX to turnover the Prepetition Pay Ahead Transfers and Postpetition Pay Ahead Transfers to FairPoint Communications;

E.    On Count 5, that judgment be entered in favor of Plaintiffs and against Defendant for damages in an amount to be determined at trial resulting from AMEX's breach of contract;

F.    On Count 6, that judgment be entered in favor of Plaintiffs and against Defendant pursuant to section 502(d) of the Bankruptcy Code, disallowing any claims filed by or asserted by AMEX, including the Proofs of Claim, or scheduled in favor of AMEX, until AMEX has paid any and all amounts for which they are determined to be liable under sections 542, 547, 549 and 550 of the Bankruptcy Code;

G.    On Count 7, that judgment be entered in favor of Plaintiffs and against Defendant disallowing and expunging the Amended Claims, and discharging and forever barring any Administrative Expense Claims (as defined in the Plan) that AMEX may hold;

H.    On Count 8, in the alternative, that judgment be entered in favor of Plaintiffs and against Defendant (a) avoiding and preserving the Fraudulent Transfers; (b) directing that the Fraudulent Transfers be set aside; and (c) recovering the Fraudulent Transfers, or the value thereof, from the Defendant for the benefit of the estates.

I.    On Count 9, that judgment be entered in favor of Plaintiffs and against Defendant declaring that AMEX is in contempt of Court because it willfully violated the automatic stay and the Stay Order, prohibiting AMEX from asserting any rights of setoff AMEX may have against FairPoint Communications and ordering AMEX to pay sanctions for its violation of the automatic stay;

J.    Interest as provided by law;

K.    Costs and disbursements in bringing this action, including attorneys fees;

L.    Such other or additional relief in favor of Plaintiffs as the Court deems just.

Dated: June 8, 2011
       New York, New York

                                        /s/ James T. Grogan_____
                                        Luc A. Despins, Esq.
                                        James T. Grogan, Esq.
                                        PAUL HASTINGS JANOFSKY &
                                        WALKER LLP
                                        Park Avenue Tower
                                        75 E. 55th Street, First Floor
                                        New York, NY 10022
                                        Telephone:  (212) 318-6000
                                        Facsimile:   (212) 319-4090

                                        *Counsel to the Plaintiffs*

# Exhibit 1

## Account Agreement

## CORPORATE SERVICES COMMERCIAL ACCOUNT AGREEMENT

This Agreement is between **AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC.** ("we," "us," "our", and "American Express") and FairPoint Communications, Inc. ("you", "your", and "Company") and governs your use of the American Express accounts described in this Agreement ("American Express Account(s)" or "Account(s)") and participation in the American Express Commercial Card Program ("Commercial Card Program"). By signing this Agreement, Company and American Express agree to be bound by the general provisions of this Agreement ("General Provisions") and the terms applicable to the American Express Account(s) described in this Agreement. All of the General Provisions apply to the American Express Account(s), provided that any terms or conditions specific to an American Express Account that are inconsistent with the General Provisions shall govern the parties' agreement with respect to Company's use of that American Express Account. Company warrants and agrees that Company policy shall limit the use of the American Express Account(s) to business purposes and that Company shall comply with such policy.

This Agreement covers the following American Express Accounts:
- Corporate Card Account ("CCA")
- Centrally Billed Products:
    - Business Travel Account ("BTA")
    - Fee Central Billing Account ("FCB")
- Corporate Purchasing Card Account ("CPC")
- Corporate Meeting Card ("CMC")

## GENERAL PROVISIONS

### 1.   ACCOUNT ESTABLISHMENT

Upon prior financial and risk management approval, American Express agrees to establish in your name the American Express Account(s) selected by you in this Agreement and will issue the following: Corporate Cards, Corporate Purchasing Cards, Corporate Meeting Cards, Centrally Billed account numbers (collectively, "Commercial Cards"), to certain of your employees who are designated by you and who are authorized to incur expenses on your behalf ("Commercial Cardmembers" or "Cardmembers") in accordance with this Agreement.

### 2.   CHARGES

All amounts charged to any American Express Account pursuant to this Agreement including, without limitation, purchases, cash advances, fees, American Express® Corporate Travelers Cheque encashments, and delinquency assessments are called "Charges".

### 3.   LIABILITY

You are liable for payment to us for all Charges incurred from the date a Commercial Cardmember's authority to incur expenses on your behalf is terminated through the date we receive notification from you of such termination.  You will also notify us if a Commercial Cardmember's authority to incur Charges on your behalf terminates (due to termination of employment or any other reason). You will use reasonable efforts to collect and dispose of plastic Commercial Cards issued to Commercial Cardmembers whose authority to incur expenses on your behalf is terminated or whose Commercial Card has been canceled. You agree to notify us upon request of a Commercial Cardmember's last known address and telephone number. Company is not liable for Charges resulting from the (i) fraudulent use of an American Express Account or Commercial Card by a third party, or (ii) Unauthorized Use of an American Express Account or Commercial Card, unless expressly provided for herein. For purposes of this Agreement, an "Unauthorized Use" is a use that did not benefit either the Company or the Commercial Cardmember and that was incurred by someone who is not the Commercial Cardmember or who did not have actual, implied, or apparent authority to use the Commercial Card or the American Express Account.

### 4.   ACCOUNT PERFORMANCE

You agree to designate Program Administrator(s) to actively manage the American Express Account(s) on your behalf.  You agree and acknowledge that such Program Administrator(s) are authorized by you to act on your behalf with respect to the American Express Account(s), and that we may rely on all directions and information we receive from Program Administrator(s) regarding the American Express Account(s), including issuance of Commercial Cards to employees designated by you. The Program Administrator(s) responsibilities shall include:

- using American Express @ Work® to conduct maintenance transactions and access reports;

- promoting awareness and use of Manage Your Card Account;
- cooperating with us towards a goal of eighty-five percent (85%) of American Express Accounts and Dollar balances to be in a current status and no more than one percent (1%) of American Express Accounts and Dollar balances to be sixty (60) days past due;
- communicating a Company policy to all Commercial Cardmembers that restricts the use of the American Express Account(s) to business purposes; and
- providing to us, upon request, a statement as to whether or not a Commercial Cardmember has been reimbursed for Charges.

American Express recommends that Company regularly audit its expense management program to insure compliance with Company policies. Company may request copies of any remittance advice provided by its Program Administrator or other designated account representatives. It is recommended that Company maintain hierarchical approval of all Charges. American Express maintains no responsibility or liability for any fraud or malfeasance engaged in by Company employees and representatives.

## 5. TERM
This Agreement shall continue in full force and effect until terminated by either party pursuant to the provisions herein.

## 6. ACCOUNT TERMINATION
Either party may terminate this Agreement or the following American Express Accounts: the Corporate Card Account, Corporate Purchasing Card Account, Corporate Meeting Card Account, at any time by providing thirty (30) days' prior written notice to the other party. Either party may terminate a Central Bill Account at any time upon written notice to the other party. This Agreement will continue to apply to Charges and any other obligations incurred prior to its termination or termination of any American Express Account(s). Termination of an American Express Account shall not of itself result in the termination of this Agreement. Either party may terminate this Agreement effective immediately on the occurrence of any of the following: (1) the liquidation or dissolution of the other party, (2) the insolvency of the other party or the filing of bankruptcy proceedings or similar proceeding with respect to the business of the other party, or (3) any material adverse change in the financial condition of the other party.

## 7. ENTIRE AGREEMENT
This Agreement is the entire agreement between the parties, and supersedes any previous oral or written agreement relating to the subject matter hereof.

## 8. AMENDMENTS
Except as otherwise provided in Section 22 - Modification of Commercial Account Program, this Agreement and the terms hereof may be amended, supplemented, waived, or modified only by an instrument in writing executed by each party.

## 9. NOTICES
All notices required or permitted under this Agreement will be in writing to the other party. In the case of notices to us, to the address specified below, and in the case of notices to you, to the Program Administrator(s) (or other address as the parties give notice of hereunder) with a copy to the address specified below and will be deemed given (a) if delivered personally (including by overnight express or messenger), upon delivery, (b) if delivered by first class, registered or certified mail (return receipt requested), upon the earlier of actual delivery or three days after being mailed, or (c) if given by telecopy, upon confirmation of receipt by telephone of automatic transmission report.

To American Express:
American Express Company, Corporate Services Operations
AESC-P
20022 North 31st Ave, Mail Code AZ-08-03-11
Phoenix, AZ 85027

To Company:
FairPoint Communications, Inc.
521 East Morehead St., Suite 250
Charlotte, NC 28202
ATTENTION: LEGAL DEPARTMENT

## 10. ASSIGNMENT
Company may not assign this Agreement, in whole or in part, without the prior written consent of American Express. American Express reserves all of its rights to assign this Agreement.

## 11. CONFIDENTIALITY
Each party agrees to preserve the confidentiality of all the terms of this Agreement, including all financial provisions, and any information it has received from the other party in the performance of this Agreement which is not publicly available. We may not use your name in promotional materials and discussions regarding your American Express Account(s) without your consent. This provision shall survive the termination of this Agreement.

If you choose to use a third party data consolidator ("Consolidator"), upon your written request and upon execution of a separate Data Protection Letter of Agreement (a copy of which may be provided to you upon request), we agree to forward your American Express Account information to Consolidator for the purpose of processing and consolidating such information.

## 12. INDEMNIFICATION

Each party agrees to indemnify and hold harmless the other party from any claims, liabilities, losses or damages (including, without limitation, reasonable attorneys' fees) asserted against the other party by a third party and based upon or arising out of the indemnifying party's failure to perform, or its negligent or wrongful performance of, any of its obligations or duties under this Agreement. Notwithstanding anything in this Agreement to the contrary, neither party shall be liable to the other party or any third party for any special, incidental, indirect, consequential, punitive, or exemplary damages of any kind arising from this Agreement or relating to the obligations hereunder.

The parties agree that the total damages that can be awarded in any claim, lawsuit, arbitration or litigation arising out of any and all causes of action which may be alleged by either party relating to the other party's obligations hereunder shall not exceed the combined total amount of fees billed to you by us pursuant to the terms of this Agreement in the twelve (12) month period immediately preceding the event giving rise to such liability regardless of the basis of the claim or cause of action provided, however, that such limitation on liability shall not apply to the extent that any claim, lawsuit, arbitration or litigation arises out of (i) Company's failure to pay Charges and any amounts owing under the Accounts, (ii) the financial arrangements under this Agreement and (iii) willful misconduct. You acknowledge and agree that we are not liable in any manner for any problems with goods or services.

## 13. CHARGES MADE IN FOREIGN CURRENCY

If you incur a Charge in a foreign currency, it will be converted into U.S. dollars on the date it is processed by us or our agents. Unless a particular rate is required by applicable law, you authorize us to choose a conversion rate that is acceptable to us for that date. Currently, the conversion rate we use for a Charge in a foreign currency is no greater than (a) the highest official conversion rate published by a government agency, or (b) the highest interbank conversion rate identified by us from customary banking sources, on the conversion date or the prior business day, **in each instance increased by 2.5%**. This conversion rate may differ from rates in effect on the date of your Charge. Charges converted by establishments (such as airlines) will be billed at the rates such establishments use.

## 14. PAYMENT

You agree not to deduct or withhold, without our prior approval, any amount shown as due on any billing statement. Acceptance of late payments, partial payments or any payment marked as being payment in full or as being a settlement of a dispute will not affect any of our rights to payment in full.

You agree that the payment terms set forth herein supersede any agreement with regard to payment terms established between you and the seller of goods or services or any payment terms that might be imputed to you and the seller under applicable law for goods or services purchased using Commercial Cards.

All payments must be sent to the payment address shown on your billing statement, and, if paid by mail, must include the remittance coupon from your billing statement. You must pay us in U.S. currency, with a single draft or check drawn on a U.S. bank and payable in U.S. dollars, or with a single negotiable instrument payable in U.S. dollars and clearable through the U.S. banking system, or through an electronic payment method clearable through the U.S. banking system. Your American Express Account number must be included on or with all payments.

Payments conforming to the above requirements that we receive no later than the hour specified on your billing statement will be credited to your American Express Account as of the day received; payments conforming to the above requirements that we receive after the hour specified on your billing statement will be credited to your American Express Account as of the following business day.

If payment does not conform to the requirements stated above, crediting may be delayed. If this happens, additional Charges may be imposed.

## 15. LATE FEES

If Charges remain unpaid, we may assess a late fee. The amount of the late fee depends on the American Express Account, the length of time the Charges have remained unpaid and the address to which your bill is sent. Late fees will not exceed the maximum allowed by law. Court costs plus reasonable legal fees may be added to any delinquent balance referred to an attorney for collection. We may charge Company $29 for each check or draft that Company submits to us that is not honored for its full amount. Late fee calculations for

each type of American Express Account are set forth in the Late Fees sections applicable to the American Express Account(s) and may include the following defined terms: (a) "Closing Date" means the date identified as the closing date on each billing statement, which is the cutoff date we determine for including Charges and payments for such billing statement; and (b) "Next Closing Date" with respect to any billing statement means the Closing Date of the billing statement that immediately follows such billing statement.

.

## 16. FEE FOR SUSPENDED AND CANCELLED ACCOUNTS

If your American Express Account becomes 90 days past due and your charge privileges are suspended, we may charge a $25 administrative suspense fee to you, subject to applicable law. If we cancel your Commercial Cardmembers' right to use their Commercial Cards due to your non-payment, we may charge a $25 reinstatement fee to you to process requests to reinstate each cancelled Commercial Card, subject to applicable law. We reserve the right, upon notice, to change these fees and/or charge additional fees in connection with suspension or cancellation of Commercial Cards issued under this Agreement.

## 17. SUBSIDIARIES AND AFFILIATES

Upon your written request, we will also establish American Express Account(s) in the name of, and issue Commercial Cards to certain employees of, your subsidiaries and/or affiliates which are approved by us and which agree to be bound by this Agreement. You agree that a report about your finances, and the finances of any of your subsidiaries or affiliates for which you request us to establish an American Express Account hereunder, may be requested from a credit reporting agency or other agency and reviewed by us in connection with this Agreement. You represent that you have the authority to execute this Agreement on behalf of each of your subsidiaries and affiliates designated by you to receive Commercial Cards hereunder. You further agree to cause each such subsidiary and/or affiliate to comply with this Agreement and you are liable to us for any breach of this Agreement by any such subsidiary and/or affiliate.

## 18. GOVERNING LAW

This Agreement shall be governed by and construed in accordance with the laws of the State of New York without reference to the choice of law doctrine of such state. Subject to the provisions in Section 23 herein, the non-exclusive venue for any litigation arising out of this Agreement shall be an appropriate federal or state court located in the State of New York, except that either party may seek temporary injunctive relief in any venue of its choosing.

## 19. FORCE MAJEURE

Neither party, nor its third party suppliers and licensors will be liable for any failure or delay in performance resulting from circumstances beyond their control including, without limitation, acts of God or nature; power, communications, satellite or network failures; unauthorized access or theft; acts of terror; or labor disputes or strikes.

## 20. CREDIT CHECKS / COMMERCIAL CARD ISSUANCE / SUSPENSION / CANCELLATION

We reserve the right to (1) ascertain the creditworthiness of Company periodically by obtaining financial reports and/or requesting financial statements from Company, (2) request a guaranty of payment, pledge of collateral, or other similar security from Company based upon our review of Company's financial statements and/or Company's use of the Commercial Card Program, (3) ascertain the creditworthiness of Company's employees who have requested a Commercial Card (by application or by designation by Company or otherwise) by obtaining credit bureau and other reports, (4) conduct periodic creditworthiness checks on Commercial Cardmembers by obtaining credit bureau and other reports, (5) approve or decline the issuance, renewal, or replacement of a Commercial Card to any person at our sole discretion, and (6) cancel, suspend or limit spending on any Commercial Card at any time for any reason, including without limitation, payment delinquency, refusal by Company to provide requested financial statements, the Unauthorized Use of a Commercial Card or American Express Account, a material adverse change in Company's financial condition, or any determination by us that failure to cancel, suspend or limit spending on a Commercial Card, American Express Account, or the Commercial Card Program would increase the financial exposure or risk to American Express. We will issue renewal or replacement Commercial Cards, subject to (5) above, until you or the Commercial Cardmember(s) advises us to cancel the Commercial Card or stop issuance of the renewal Commercial Card. You acknowledge that you are acting as an agent of your employees with respect to any request for issuance of a Commercial Card.

## 21. MEMBERSHIP REWARDS

The Corporate Card Account is the only American Express Account eligible for enrollment in the *Membership Rewards®* Program.

## 22. MODIFICATION OF COMMERCIAL ACCOUNT PROGRAM

We reserve the right to modify the Commercial Account Program on a client-wide basis. For purposes of clarification, no modification to the Commercial Account Program shall serve to treat you less favorably than any other Commercial Card client.

## 23. MEDIATION / ARBITRATION

American Express and Company agree that any and all disputes, claims or controversies arising out of or related to this Agreement

shall be submitted first to mediation and if the matter is not resolved through mediation, it shall be submitted to arbitration unless either or both parties elect to pursue resolution through litigation. Unless American Express and Company agree otherwise, any mediation and/or arbitration shall take place in the State of New York, New York County, and shall be administered by, and pursuant to the rules of, the American Arbitration Association unless otherwise agreed to by the parties. Disputes shall be mediated, arbitrated and/or litigated on an individual basis. There shall be no right or authority for any disputes to be mediated, arbitrated or litigated on a class action basis or in a purported representative capacity on behalf of the general public, other travel customers or other persons similarly situated. Any authority to resolve disputes and to make awards or enter judgments is limited to disputes between you and us alone, and is subject to the limitations of liability set forth above. Furthermore, disputes brought by either party against the other may not be joined or consolidated in mediation, arbitration or litigation with disputes brought by or against any third party, unless agreed to in writing by all parties. No award or decision shall be given preclusive effect as to issues or claims in any dispute with anyone who is not a party to the mediation, arbitration or litigation. Should any portion of this Section regarding authority to resolve disputes between only you and us be stricken from this Agreement or deemed otherwise unenforceable, this entire Section shall be stricken from this Agreement. The provisions of this Section may be enforced in a court of competent jurisdiction and the party seeking enforcement shall be entitled to an award of all costs, fees and expenses (including attorney fees), to be paid by the party against whom enforcement is ordered.

## 24.   MISCELLANEOUS

Any claim or cause of action arising out of or related to this Agreement must be filed by Company within one (1) year after such claim or cause of action arose or forever be barred. Except for American Express' affiliates, suppliers and licensors, no third party is a beneficiary of this Agreement. Failure to enforce any term or conditions of this Agreement shall not be a waiver of the right to later enforce such term or condition or any other term or condition of this Agreement.

In the event any provision of this Agreement is held to be invalid or unenforceable, the remaining provisions of this Agreement will remain in full force and effect.

## AMERICAN EXPRESS ACCOUNT PROVISIONS

## 25.   CORPORATE CARD ACCOUNT
**25.1.   Charges –** Each Cardmember is responsible for all Charges posted to his or her Corporate Card Account in accordance with the terms of the Corporate Cardmember Agreement.
**25.2.   Liability –** Subject to the provisions set forth in Section 3 herein, with respect to Corporate Cards, the liability is as follows:

Expanded Protection: For Charges that are for business expenses incurred on your behalf and in accordance with your policies, you will either reimburse the Cardmember or pay us directly upon your receipt of a statement of such Charges.
**25.3.   Annual Corporate Card Fees -** An annual fee will be payable to us for each Corporate Card and will be determined in accordance with our then current Corporate Card fee policies.
**25.4   Late Fees for Individually Billed Accounts –** For Corporate Card Accounts that are individually billed, late fees will accrue according to the Cardmember Agreement in effect at the time of the Charges.
**25.5.   Late Fees for Company Bill/Company Payment Accounts –** For Corporate Card Accounts (other than Corporate Platinum Card Accounts) with the Company Bill/Company Payment billing option, late fees will accrue as follows: (a) if there are any amounts totaling more than $35.00 , in aggregate, that were incurred during a statement billing period and that have not been paid and credited to your Account by the 14th day after the Next Closing Date, a late fee of $29.00 will be charged per Cardmember; and (b) if there are any amounts totaling more than $35.00, in aggregate, that were incurred during a statement billing period and that have not been paid and credited to your Account by the following Next Closing Date, a late fee equal to the greater of $29.00 per Cardmember or 2.99% of all amounts not credited for at least one statement billing period will be charged; and (c) if payment of the total amounts due is not credited to your Account by successive Next Closing Dates, we may assess a fee equal to the greater of $29.00 per Cardmember or 2.99% of all amounts not credited for at least one statement billing period. For Corporate Platinum Card Accounts with the Company Bill/Company Payment billing option, late fees will accrue pursuant to clauses (b) and (c) above.
**25.6.   Expedited Delivery Fee -** We reserve the right to charge a fee for granting a Program Administrator's request for expedited delivery of Corporate Cards.

## 26.   CENTRALLY BILLED ACCOUNTS – GENERAL PROVISIONS
**26.1.   Late Fees -.** Late fees will accrue as follows: (a) if there are any amounts totaling more than $35.00, in aggregate, that were incurred during a statement billing period and that have not been paid and credited to your Account by the 14th day after the

Next Closing Date, a late fee of $29.00 will be charged; and (b) if there are any amounts totaling more than $35.00, in aggregate, that were incurred during a statement billing period and that have not been paid and credited to your Account by the following Next Closing Date, a late fee equal to the greater of $29.00 or 2.99% of all amounts not credited for at least one statement billing period will be charged; and (c) if payment of the total amounts due is not credited to your Account by successive Next Closing Dates, we may assess a fee equal to the greater of $29.00 or 2.99% of all amounts not credited for at least one statement billing period.

26.2.    **Liability** - We will send to Company a monthly statement ("Statement") listing all Charges. Company agrees to pay us in full for all Charges upon its receipt of the Statement. Company is liable to us for payment in full for all Charges made by Company's employees or agents, including without limitation, Charges resulting from the (i) fraudulent use of the Centrally Billed Account(s) by a third party, (ii) Unauthorized Use of the Centrally Billed Account, or (iii) misuse of the Centrally Billed Account(s) by any person currently or formerly employed by Company or any person who at any time was given access to an account number or authorization to use the Centrally Billed Account(s) by Company.   Company must notify us of any alleged errors or disputes within 60 days of the date such Charges first appear on a Statement.

27.  Intentionally Omitted

## 28.    BUSINESS TRAVEL ACCOUNT

28.1. **Issuance** - Upon Company's request, we will assign supplementary accounts under the Business Travel Account to certain of Company's employees, departments, divisions or other business groups ( supplementary accounts, collectively with the Business Travel Account, are referred to in this Agreement as the "BTA"). Company will only use the BTA to charge air and rail transportation tickets for business use through its travel agents.

28.2. **Travel Agents** - Company will instruct its travel agents ("Agents") in the use of the BTA and will provide Agents with a list ("List") of persons authorized by Company to use the BTA and will notify Agents of any changes to such List. Company shall resolve any unreconciled Charges directly with its Agent or the supplier providing services. We are not responsible for the acts or omissions of any travel agents, carriers, or other firms providing services (other than us).

28.3. **Annual Fee** - The annual fee for the BTA is $150 and is subject to change by us upon not less than 60 days prior written notice to Company. This annual fee will be waived if Company uses American Express as its Agent.

28.4. **Charges and Liability** - Company must notify us of Charges regarding returned or lost tickets of which Company has no knowledge within 60 days of the date such Charges first appear on a Statement. Subject to the provisions set forth in Section 26.2 herein, Company is also liable to us for payment in full for all Charges which result from the Unauthorized Use or misuse of the BTA by any Agent (other than us), or any person currently or formerly included on a List.

28.5. **Miscellaneous** - We will notify Company of changes to the terms of certain insurance programs available to persons using the BTA. Company agrees to notify all persons authorized to use the BTA of any such changes.

29.  Intentionally Omitted

30.  Intentionally Omitted

31.  Intentionally Omitted

## 32.    FEE CENTRAL BILLING ACCOUNT

32.1. **Issuance** - We will establish a Fee Central Billing Account ("FCB") in Company's name provided that Company has established a Corporate Card Account pursuant to the terms of this Agreement.

32.2. **Charges** - Annual fees for Corporate Cards issued pursuant to this Agreement will be billed to the FCB. An entry will appear on the applicable Corporate Card statement indicating the amount that has been billed to the FCB.

32.3. **Miscellaneous** - If the Corporate Card Account is terminated for any reason, the FCB will terminate automatically. Company is responsible for reconciling any such credits as between Company and the Cardmember. No late fees shall apply to Charges billed to the FCB.

## 33.    CORPORATE PURCHASING CARD (CPC) ACCOUNT

33.1. **Use of Corporate Purchasing Card** - You agree that you will implement and communicate Company policies that require Corporate Purchasing Cards issued hereunder to be used only for the purchase of goods and services on your behalf and in

accordance with your policies. You also agree that your policies will be in strict conformity with the Corporate Purchasing Card Terms and Conditions included with each Corporate Purchasing Card issued hereunder. In the event any of the terms and conditions of this Agreement conflict with those of the Corporate Purchasing Card Terms and Conditions, this Agreement will prevail. Individual use of Corporate Purchasing Cards is governed by the Corporate Purchasing Cardmember Agreement.

**33.2. Liability**:

(a) For Corporate Purchasing Cards issued <u>with</u> a corresponding plastic card, Company is liable for Charges in accordance with the terms set forth in Section 3 of this Agreement.

(b) For Corporate Purchasing Cards issued <u>without</u> a corresponding plastic card, Company is liable to us for payment in full for all Charges including, without limitation, Charges resulting from the (i) fraudulent use of a Corporate Purchasing Card by a third party, (ii) Unauthorized Use of a Corporate Purchasing Card, or (iii) misuse by any person currently or formerly employed by Company or any person who at any time was given access to the Corporate Purchasing Card or authorization to use the Corporate Purchasing Card by Company.

**33.3. Expedited Delivery Fee** - We reserve the right to charge a fee for granting a Program Administrator's request for expedited delivery of Corporate Purchasing Cards.

**33.4. Payment Terms / Settlement** - You agree to pay all Charges shown on each consolidated monthly statement (the "Consolidated Statement") within 14 calendar days after the Closing Date specified on the applicable Consolidated Statement. If you believe any Charge shown on a Consolidated Statement is in error or in dispute with the seller, you may request, and we may institute and maintain for a reasonable period, a temporary credit on the Corporate Purchasing Card Account in the amount of the disputed portion of the Charge while we investigate the error or you seek to resolve the dispute.

**33.5. Late Fees** - The amount of the late fee depends on the length of time an account on any Consolidated Statement has remained unpaid. If there are any amounts totaling more than $35.00, in aggregate, that were incurred during a statement billing period on any Consolidated Statement and that have not been paid and credited to your Account by the Next Closing Date of such Consolidated Statement, then a late fee equal to the greater of $29.00 per Cardmember or 2.99% of all amounts not credited for at least one statement billing period will be charged.

**33.6. Problems with Goods or Services** - You agree to resolve any disputes concerning goods or services purchased using the Corporate Purchasing Card directly with the seller.

**33.7. Access to Information** - We may compile and convey to you certain information provided to us by the sellers of goods and services you purchased using the Corporate Purchasing Card, such as, for example, a seller's tax identification number and SIC number and the seller's status as a minority-owned or woman-owned business. We do not guaranty the accuracy of any such information and, by conveying such information to you, do not undertake to perform on your behalf any reporting, compliance or other obligation or requirement applicable to you pursuant to any law, regulation, executive order or court order.

**33.8. CPC Department Account** – Upon your request, we shall establish account(s) for the billing of purchases from certain merchants that accept payment via such accounts ("CPC Department Accounts"). Except as specifically provided herein, the terms of this Agreement which are applicable to the CPC Account and/or Corporate Purchasing Cards shall apply to the CPC Department Account. Company is liable to us for payment in full for all Charges made to a CPC Department Account, including, without limitation, Charges resulting from the (i) fraudulent use of a CPC Department Account by a third party, or (ii) Unauthorized Use of a CPC Department Account, or (iii) misuse by any person currently or formerly employed by Company or any person who at any time was given access to a CPC Department Account or authorization to use a CPC Department Account by Company.

**33.9. Monthly Spending Limit** - We may assign a monthly spending limit (the "Monthly Account Limit") to the CPC Account. The aggregate dollar amount of CPC Charges to Corporate Purchasing Cards issued on the CPC Account may not exceed the Monthly Account Limit. Once the Monthly Account Limit has been reached during a billing cycle, charge privileges for Corporate Purchasing Cards issued on the CPC Account will be suspended until the beginning of the next billing cycle. We will notify you of the Monthly Account Limit, and we may change the Monthly Account Limit upon notice to you. If authorization for any CPC Charge is declined based upon the Monthly Account Limit, we may notify the applicable merchant of the reason for the decline of the authorization request. You agree to notify your Cardmembers of the Monthly Account Limit and of the consequences of exceeding the Monthly Account Limit.

**33.10.Card Limits** - We may assign limits ("Card Functionality Limits") to particular Corporate Purchasing Cards issued on the CPC Account based upon dollar amounts charged per billing cycle, the type of merchant establishments at which CPC Charges may be incurred, or other parameters you and we agree upon. Certain CPC Charges in excess of or outside the parameters of the Monthly Account Limit or Card Functionality Limits may be incurred. Notwithstanding anything to the contrary contained herein or in any other agreement, and except for CPC Charges resulting from the (i) fraudulent use or (ii) Unauthorized Use of a

Corporate Purchasing Card, you are liable to us for CPC Charges in excess of or outside the parameters of any Monthly Account Limit or any Card Functionality Limit.

**34.** Intentionally Omitted

**35.** Intentionally Omitted

**36.** **CORPORATE MEETING CARD (CMC) ACCOUNT**
**36.1. Liability** –You are liable for Charges incurred on the CMC Account and/or Corporate Meeting Card in accordance with the terms set forth in Section 3 of this Agreement. Notwithstanding the foregoing, for CMC Accounts specific to a Company department or meeting/event ("CMC Department Account(s)") that are not issued in the name of an individual, you will be liable to us for payment in full for all Charges, including, without limitation, Meeting Card Charges resulting from the (i) fraudulent use or (ii) Unauthorized Use of the CMC Department Account.
**36.2. Late Fees -** Late fees will accrue as follows: (a) if there are any amounts totaling more than $35.00, in aggregate, that were incurred during a statement billing period and that have not been paid and credited to your Account by the 14th day after the Next Closing Date, a late fee of $29.00 will be charged per Cardmember; and (b) if there are any amounts totaling more than $35.00, in aggregate, that were incurred during a statement billing period and that have not been paid and credited to your Account by the following Next Closing Date, a late fee equal to the greater of $29.00 per Cardmember or 2.99% of all amounts not credited for at least one statement billing period will be charged; and (c) if payment of the total amounts due is not credited to your Account by successive Next Closing Dates, we may assess a fee equal to the greater of $29.00 per Cardmember or 2.99% of all amounts not credited for at least one statement billing period.
**36.3. Annual Corporate Meeting Card Fee -** An annual fee will be payable by you for each Meeting Card. The annual fee assessed during each annual period will be determined in accordance with our then current Meeting Card fee schedule or, for existing Corporate Card customers, in accordance with your Corporate Card Account Agreement.
**36.4. Type of Meeting Card Account -** The type of Meeting Card Account that you have selected is specified in Schedule A (attached hereto).
**36.5. Corporate Meeting Card Supplemental Account**
The provisions of this Section 36.5 shall take effect on the date of execution of the Corporate Meeting Card Supplemental Account Application ("Supplemental Account Application"). Except as specifically provided herein, the terms of this Agreement which are applicable to the CMC Account and/or Meeting Cards shall apply to the Corporate Meeting Card Supplemental Account.
**36.5.1.** Upon Company's request, we will assign cards with account numbers that represent supplemental accounts to the Company's primary Corporate Meeting Card Account, to certain of Company's employees, departments, divisions or other business groups (all individual supplemental card accounts, collectively with the Corporate Meeting Card Supplemental Account, are referred to as the "CMC Supplemental Account").
**36.5.2.** Only plastic cards shall be issued in connection with Company's CMC Supplemental Account. Plastic cards issued under a CMC Supplemental Account are subject to the same annual fee, if any, for Meeting Cards issued under this Agreement.
**36.5.3.** The CMC Supplemental Account(s) established pursuant to this Section 36.5 will be subject to any limits indicated by you on the Supplemental Account Application.
**36.5.4.** We may cancel or suspend the CMC Supplemental Account or any individual account number at any time with or without cause and without prior notice to you.

**The balance of this page has been left blank intentionally.**

The Terms and Conditions of this Commercial Account Agreement are effective as of the last date written below ("Effective Date").

**AMERICAN EXPRESS TRAVEL RELATED**
**SERVICES COMPANY, INC.**

By: _____

Name: Thomas Tierney; Jean Kanarian

Title: Senior Vice President

Date: _____

FairPoint Communications, Inc.

By: _____

Name: Peter G. Nixon

Title: President

Date: March 20, 2008 _____

## Exhibit 2

## Pre-filing Agreement



*April 27, 2009*

Via email

**Mr. Tom Griffin**
**Vice President and Treasurer**
**FairPoint Communications, Inc.**
**521 E. Morehead St.**
**Charlotte, NC 28210**

Re:     American Express Relationships

Dear Tom,

This letter will confirm our discussion with regard to the various account relationships between *FairPoint Communications, Inc.* ("Company") and American Express Travel Related Services Company, Inc. ("American Express"). The parties have agreed to maintain a business relationship subject to the terms of this letter in light of the Company's financial situation.

In the event that Company files for bankruptcy, the parties hereby agree that the Company will request to satisfy any pre-petition amounts due and owing pursuant to a First Day Order, and shall continue to pay all amounts to American Express for post-petition charging activity.

Types of Relationships

1. *Corporate Card Products* - Company maintains the use of three different types of American Express Corporate Card products. The products are as follows:

- American Express Corporate Card Program.

  American Express® Corporate Cards issued to Company employees pursuant to the Corporate Card Account Agreement ("CCA Agreement") between Company and American Express. Corporate Card account statements are forwarded directly to the Company employees. Corporate Cards are used by Company employees to charge business related travel and entertainment expenses.

- American Express Central Billed Accounts.

  This type of account includes business travel accounts issued to Company used to charge employee business travel for airlines, hotels and car rental companies.

- American Express Corporate Purchasing Card Program.

  American Express Corporate Purchasing Cards issued to Company employees pursuant to the Corporate Purchasing Card Agreement ("CPC Agreement") between Company and American Express, with account statements forward directly to the employees. Corporate Purchasing Cards

are used by Company employees to procure items, such as office supplies, which are used in the ordinary course of the operation of Company's business.

- All of the Corporate Card, Central Billed and Corporate Purchasing Card accounts utilized by Company are collectively referred to as the Accounts.

2.   *American Express Card Acceptance* - Company and American Express are also parties to an American Express® Card Acceptance Agreement ("Card Acceptance Agreement") pursuant to which, among other things, Company and American Express permit American Express cardmembers ("Cardmembers") to purchase Company goods and services with certain account-access devices issued by American Express, its subsidiaries, affiliates and licensees and which bear the American Express logo.

## Terms

1. In the event that the Company commences Chapter 11 proceeding, the Company hereby agrees to do the following:

- First Day Order

  - In the event that Company files for bankruptcy, Company shall include in its First Day Order package a motion seeking approval to pay American Express any and all sums due and owing at the time of bankruptcy petition filing.

  - Further, the parties agree that the Accounts should be included in different motions and/or different parts of the same motion, reflecting the nature of the charging activity for that type of Account.

    - ➢ The Corporate Card Program should be included in the Employee Reimbursement Motion, since the charging on these accounts represents employee charging for such expenses as corporate travel, hotel accommodations and meals for which employees are individually billed and reimbursed.

    - ➢ The Central Billed Accounts and Corporate Purchasing Card Program should be included in the debtor's critical vendor motion.

  - To the extent applicable, the following language shall be used by the debtor in filing its First Day Motion package regarding the Corporate Card Program, the Central Billed Accounts and the Corporate Purchasing Card Program:

    - ➢ The debtor has policies whereby its employees seek reimbursement of business related expenses. The expenses are ordinary course expenses that debtor's employees incur in performing their job functions. Included in this category are all expenses incurred on the employees American Express Corporate Cards. It is essential to the continued operation of the debtor's business that the debtor be permitted to continue reimbursing employees for such expenses.

    - ➢ As an essential part of the operation of its business, the debtor required employees to use the American Express Corporate Purchasing Card (CPC) to pay for debtor's procurement of items, such as office supplies, which are used in the ordinary course of the operation of debtor's business. Similarly, the debtor requires certain of its employees to charge expenses for business travel which is undertaken in the ordinary course of performing their job functions to debtor's American Express Central Bill Account. Such expenses are the same types of expenses as are incurred on the Corporate Card program. Use of the CPC and Central Billed Accounts is an integral part of the debtor's cash management

and account functions, and continuation of the ability of the debtor's employees to use the CPC for procurement and the Central Bill Accounts for business travel is essential to the continued operation of the debtor's business.

- Should American Express' suggested language need to be modified, Company must seek American Express' approval of the modifications.

- Company will provide American Express with a copy of the First Day Order affecting American Express prior to filing same.

2. In the event that Company commences Chapter 11 reorganization, Company and American Express agree to enter into an addendum to the Card Acceptance Agreement that will permit Company to continue, ratify and adopt the Card Acceptance Agreement subject to, among other things, the following:

(i) Company's curing all pre-petition and post-petition defaults, if any, under the Card Acceptance Agreement, the Account agreements, and any other agreements between Company and American Express and/or any of American Express' parent, subsidiaries or affiliates, and

(ii) American Express' continued ability to recoup, offset and deduct any chargebacks processed by American Express or credits due to Cardmembers from Company against amounts otherwise due Company under the Card Acceptance Agreement, whether pre-petition or post-petition, without regard to the date of the purchase giving rise to the chargeback or credit, and

(iii) American Express' ability to establish a reserve out of funds payable to Company to protect its financial exposure or risk of loss under the Card Acceptance Agreement (including, but not limited to the dollar amount of charges submitted by Company for goods or services not yet received by Cardmembers) and to protect its financial exposure or risk of loss under the Account agreements, and any other agreements between Company, its subsidiaries or affiliates on the one hand and American Express and/or any of its parent, subsidiaries or affiliates on the other hand.

## Amendment to CCA Agreement

This letter agreement shall constitute an amendment to the CCA Agreement. Specifically, Company explicitly agrees to the following changes to the CCA Agreement:

- Notwithstanding anything to the contrary in the CCA Agreement, Company shall be jointly and severally liable with the applicable Company employee for all charges incurred by that applicable Company employee, before and after the date of this letter agreement, on Corporate Cards issued under the CCA Agreement; and

- Company shall not be eligible to waive its liability for any Corporate Card charges under the American Express waiver policy; and

- Company agrees to forfeit any and all financial incentives that may be owed to Company pursuant to the terms the CCA Agreement, including but not limited to Corporate Card annual fee waivers. Accordingly, any references to a financial incentive within the CCA Agreement, or any appendices thereto, shall be omitted from the CCA Agreement and American Express may immediately commence billing, and continue billing on an annual basis, annual fees for all Corporate Cards at American Express' then current Corporate Card annual fee rates.

<u>Worldwide Relationships</u>

- Company and American Express acknowledge that each party's worldwide subsidiaries and affiliates may have relationships with one another, whereby regional programs that are similar to the Accounts have been established. Company acknowledges that such American Express worldwide subsidiaries and affiliates may request protection from such Company worldwide subsidiaries and affiliates in order to maintain a pre-petition and/or post-petition relationship. The protection may be in the form of establishing collateral on such regional accounts or as otherwise agreed upon between such regional entities.

<u>Miscellaneous</u>

- American Express will take all reasonable precautions to ensure the Accounts remain open while the parties act in accord with this agreement. Should an Account be accidentally closed, American Express will open the Account in a reasonable time period.

- The parties agree that all business related charging automatically qualifies as an administrative expense pursuant to 11 U.S.C. § 503.

- The parties intend to agree upon the exact amount due and owing to American Express after each has had reasonable opportunity to review the Accounts.

Should you wish to discuss any of the above noted terms, contact me at your convenience. This letter is in the nature of a settlement agreement and cannot be used as an admission against interest or be deemed to waive any rights American Express may hold against Company or any of its employees. Moreover, American Express specifically reserves all of its rights under the various contracts underlying the Accounts and under applicable law and equity.

Sincerely,

/S/ Lyn Olney

Lyn Olney
Credit Manager
American Express
Global Institutional Risk Management

Agreed and accepted by *FairPoint Communications, Inc*

By: _____

Name: ___Thomas E. Griffin_____

Title: _____Treasurer_____

Date: _____May 22, 2009_____

<u>**Exhibit 3**</u>

**Pay Ahead Agreement**

## AMERICAN EXPRESS® PAY AHEAD SERVICE
Addendum to Corporate Services Commercial Account Agreement

These terms and conditions govern your use of the American Express® Pay Ahead Service and any Pay Ahead Cards (as defined in Section 2 below) issued to your employees ("Terms and Conditions"). The terms "you" and "your" refer to the business entity that executes these Terms and Conditions below. The terms "we," "our" and "us" refer to American Express Travel Related Services Company, Inc. These Terms and Conditions will supplement the Corporate Services Commercial Account Agreement between you and us (as may be amended from time to time, the "Master Agreement") and the terms and conditions that apply to your Eligible Accounts (as defined in Section 1 below).

## 1.     THE PAY AHEAD SERVICE

The Pay Ahead Service provides you with an option to prepay your eligible commercial card account pursuant to terms and conditions determined by us. Our standard payment remittance policies apply. Funds remitted by you pursuant to the Pay Ahead Service will not become available for your use for 48 hours after remittance or such shorter or longer interval as we may determine from time to time. We may limit the balance you may maintain in the Pay Ahead Service at our discretion. All payments (a) must be made from your bank account, (b) must specifically reference the account number of the Pay Ahead Account (as defined below), and (c) must be made by wire transfer via EFT Fedwire. Any attempt by you to make payments to the Pay Ahead Service by any payment method other than EFT Fedwire may, in our sole discretion, be the basis for automatic and immediate termination of the Pay Ahead Service and your entire commercial card program. Payments to the Pay Ahead Service may not include payments designated to be applied to other accounts that do not feature the Pay Ahead Service. Available monthly spending amounts for the Pay Ahead Service may not exceed 30% of your monthly revenues. Accounts eligible for the Pay Ahead Service must be Centrally Billed Accounts (i.e., invoiced to and payable by, you) and may, in our sole discretion, include Centrally Billed Accounts you have already established with us and new Centrally Billed Accounts you may establish with us. These are referred to as Eligible Accounts. Eligible Accounts under which the Pay Ahead Cards are issued are referred to as Pay Ahead Accounts.

## 2.     THE PAY AHEAD CARD

For Eligible Accounts for which the Pay Ahead Service is available, authorized employees may use their currently issued card or we may issue a separate card for your authorized employees to use. Authorized employees may also use an account number to access

the Pay Ahead Service. All such cards and the process of using an account number to access the Pay Ahead Service are referred to herein as Pay Ahead Card(s). The use of the Pay Ahead Service and Pay Ahead Cards are subject to these Terms and Conditions as well as the terms and conditions of the Corporate Services Commercial Account Agreement to which this is an Addendum. Each Pay Ahead Card must be signed on the back by the authorized employee, where indicated. We reserve the right to delay activation and use of any Pay Ahead Card for up to 4 hours after you notify us of the identity of an employee who has been authorized to use a Pay Ahead Card.

## 3.     CENTRAL BILL ACCOUNT TERMS

Only Centrally Billed Accounts are eligible for the Pay Ahead Service. Therefore, the terms and conditions of the Master Agreement and/or the Eligible Accounts applicable to Centrally Billed Accounts, including, without limitation, provisions relating to late fees and liability, will continue to apply to the Pay Ahead Accounts. Refer to the Central Bill Account terms for further information.

## 4.     USING THE PAY AHEAD CARD

Authorized employees may present the Pay Ahead Card to the Merchant at the time of payment and sign the receipt with the same signature used when the back of the Pay Ahead Card was signed. The receipt should be retained as a record of the transaction. You agree that the Pay Ahead Cards may be used only at Merchants and only for lawful commercial purposes. However, you authorize us to deduct the full amount of each purchase, including taxes and any other fees or charges from the Available Funds whenever a Pay Ahead Card is used to make a purchase, whether or not the restrictions in the preceding sentence are honored, and whether or not the particular purpose of the charge is authorized, as between you and the person making the purchase. A Pay Ahead Card is not transferable and you agree not to permit anyone other than authorized employees to use Pay Ahead Cards. If a transaction occurs despite insufficient Available Funds on the Pay Ahead Card, you agree to reimburse us, upon request, for the amount of the debit balance created on the Pay Ahead Service, in the same fashion as you would have to cover an overdraft in your bank account. From time to time the Pay Ahead Card or the Pay Ahead Service may be inoperative. If this occurs, you will be unable to use your Pay Ahead Card and/or obtain information about your Available Funds.

## 5. NO WARRANTIES

We are not responsible or liable to you (i) for any interruption of the Pay Ahead Card Service, (ii) for the quality, safety, legality, or any other aspect of any goods or services purchased from any Merchant with any Pay Ahead Card, (iii) if any Merchant refuses to honor the Pay Ahead Card or special offers and/or (iv) for any other problems you may have with any Merchant. If you have a dispute with a Merchant, you agree to settle the dispute directly with the Merchant. If a Merchant fails to honor a Pay Ahead Card, call the Customer Service Number to report the incident.

## 6. CHANGING THESE TERMS AND CONDITIONS / NOTICES / PAY AHEAD SERVICE CANCELLATION

We may suspend, cancel, add, modify or delete any feature offered in connection with the Pay Ahead Service and the Pay Ahead Cards at our sole discretion at any time, with or without cause, and without giving you advance notice, unless otherwise required by applicable law. Any notice given by us shall be deemed given when deposited in the United States mail, postage prepaid, addressed to you at the latest address shown on our records or, where applicable, electronic notice. If we cancel your Pay Ahead Service, any Available Funds remaining in the Pay Ahead Service upon such cancellation, after payment for all applicable fees, will be returned to you. Any returned funds will be sent to your bank account. If the "valid thru" date on any Pay Ahead Card has not expired, we may condition reimbursement upon return of all Pay Ahead Cards. All Pay Ahead Cards are our property.

## 7. FRAUD AND SECURITY

The "valid thru" date indicated on any Pay Ahead Card is a security mechanism required to ensure that the Pay Ahead Card can be used at Merchants that request and/or require customers to provide a plastic expiration date during the transaction process. A Pay Ahead Card must not be used after the "valid thru" date. The Available Funds on the Pay Ahead Card and in the Pay Ahead Service do not expire, but will be reduced by Charges and Fees as described in the Account Terms and Conditions. If Available Funds remain on the Pay Ahead Card and in the Pay Ahead Service after the "valid thru" date, call the Customer Service Number to obtain a free replacement Pay Ahead Card or for instructions on how to redeem the Available Funds. We reserve the right to decline to issue a replacement Pay Ahead Card. You agree to (a) ensure that only authorized employees have access to the Pay Ahead Service and Pay Ahead Cards; and (b) take all necessary measures to prevent unauthorized ordering of or access to the Pay Ahead Service and Pay Ahead Cards by any person other than an authorized employee for permissible purposes. You must maintain, and be able to share with us upon request, a current list of all authorized employees. We reserve the right to terminate your use of the Pay Ahead Service if you do not comply with the requirements of this Section.

## 8. INCONSISTENCIES

In the event of any inconsistencies between these Terms and Conditions and the Master Agreement, including the terms and conditions of the Eligible Accounts, these Terms and Conditions will govern and control.

Please sign in the space provided below to acknowledge your receipt and acceptance of these Terms and Conditions and return the originally signed document to your American Express account representative. **COMPANY'S NAME MUST BE FILLED IN BELOW.**

Acknowledged and agreed:

*COMPANY NAME*: FairPoint Communications, Inc.

By:

Name: *Thomas E. Griffin*

Title: *VP & Treasurer*

Date: *9/15/09*

401330025v1

<u>**Exhibit 4**</u>

**Preferential Transfers**

## Corporate Card Account

| Invoice Number | Invoice Date | Invoice Amount | Debtor | Bank Reference Number / Wire Reference Number (If Any) | Transfer Payment Date | Transfer Amount |
|---|---|---|---|---|---|---|
| 1A2000-001-(11226365) | 5-Aug-09 | $191,486.97 | FCI | | | |
| | | | | 23009778982 | 11-Aug-09 | $191,486.97 |
| IA2000-001-(11668758) | 5-Sept-09 | $217,254.73 | FCI | | | |
| | | | | 53003329592 | 10-Sep-09 | $217,254.73 |
| IA2000-001-(12104919) | 6-Oct-09 | $184,163.49 | FCI | | | |
| | | | | ACH Direct Deposit | 8-Oct-09 | $184,163.49 |
| Total Corporate Card Account Transfers: | | | | | | $592,905.19 |

## Corporate Purchasing Card Account

| Invoice Number | Invoice Date | Invoice Amount | Debtor | Bank Reference Number / Wire Reference Number (If Any) | Transfer Payment Date | Transfer Amount |
|---|---|---|---|---|---|---|
| 795922350907 | 31-July-09 | $250,709.39 | FCI | | | |
| | | | | 16004145226 | 4-Aug-09 | $250,709.39 |
| 795922350908 | 22-Aug-09 | $379,694.19 | FCI | | | |
| | | | | 20090828-00001376 | 28-Aug-09 | $379,694.19 |
| 795922350908 | 22-Aug-09 | $379,694.19 | FCI | | | |
| | | | | 43002367309 | 31-Aug-09 | $379,694.19 |
| 795922350909 | 22-Sept-09 | $122,945.39 | FCI | | | |
| | | | | ACH Direct Deposit | 30-Sept-09 | $122,945.39 |
| Total Corporate Purchasing Card Account Transfers: | | | | | | $1,133,043.16 |

**TOTAL PREFERENTIAL TRANSFERS: $1,725,948.35**